ACCEPTED
05-14-00385-CR
FIFTH COURT OF APPEALS
DALLAS, TEXAS
1/16/2015 11:15:41 AM
LISA MATZ
CLERK

**IN THE COURT OF APPEALS
FIFTH DISTRICT OF TEXAS
AT DALLAS, TEXAS**

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
1/16/2015 11:15:41 AM
_____LISA MATZ_____
Clerk

## 05-14-00385-CR

## CESAR BENITEZ

**Appellant,**

## V.

## THE STATE OF TEXAS,

**Appellee.**

**Appeal in Cause Number F13-55077-M
In the 194th Judicial District Court
Dallas County, Texas**

## BRIEF FOR APPELLANT

**Russ Henrichs
P.O. Box 190983
Dallas, Texas 75219
214/651-0759
Texas State Bar No.09475000**

**Attorney for Appellant
On Appeal**

## PARTIES TO THE CASE

Pursuant to Rule 38 of the Texas Rules of Appellate Procedure, the parties to the case were:

    1. The State of Texas, Appellee
    2. **CESAR BENITEZ**, Appellant

Representing the State of Texas, Appellee, are members of the Dallas County District Attorney's Office, 133 N. Riverfront Blvd., Dallas, TX 75207.

Appearing at trial was:

**Hon. Amy Derrick**
**SBOT No. 24045778**
**District Attorney's Office**
**133 N. Riverfront Blvd.**
**Eleventh Floor**
**Dallas, TX 75202**

Representing the Appellant, **CESAR BENITEZ**, at trial:

**Hon. John Key**
**SBOT No. 24004168**
**Dallas, Texas**

Representing the Appellant, **CESAR BENITEZ**, on appeal:

**RUSS HENRICHS**
**P.O. Box 190983**
**Dallas, Texas 75219**

# TABLE OF CONTENTS

**PAGE**

Parties to the Case ................................................................................. ii

Table of Contents ................................................................................. iii

Index of Authorities ................................................................................. iv

Statement of the Case ................................................................................. 2-3

Issues Presented for Review ................................................................................. 3

Statement of Facts ................................................................................. 3-16

Point of Error No. One Restated ................................................................................. 17

**THE APPELLANT WAS DENIED DUE PROCESS WHEN THE JUDGE ORDERED A PRE-SENTENCE INVESTIGATION WHICH THE APPELLANT DID NOT RECEIVE OR REVIEW PRIOR TO HIS PUNISHMENT HEARING.**

Summary of the Argument ................................................................................. 17-19

Argument ................................................................................. 19-22

Prayer ................................................................................. 23

Certificate of Service ................................................................................. 23

# INDEX OF AUTHORITIES

**PAGE**

**CASES**

*Gardner v. Fla*., 430 U.S. 349, 97 S. Ct. 1197, 51 L. Ed. 2d 393, 1977 U.S.
LEXIS 62 (U.S. 1977) ............................................................... 20

*Supreme Court in Woodson v North Carolina* (1976) 428 US 280, 49 L Ed 2d
944, 96 S Ct 2978, and *Roberts v Louisiana* (1976) 428 US 325, 49 L Ed
2d 974, 96 S Ct 3001. [Per Stevens, J., Stewart, J., Powell, J., Burger, Ch.
J., White, J., and Blackmun, J. Dissenting in part: Brennan and Marshall,
JJ. Dissenting: Rehnquist, J.] .................................................... 21

**STATUTES**

Article 42.12 section 9 (Code Crim. Proc.) ....................................... 19

# 05-14-00385-CR

_____

## IN THE COURT OF APPEALS
## FIFTH DISTRICT OF TEXAS
## AT DALLAS, TEXAS

_____

## CESAR BENITEZ

**Appellant,**

## V.

## THE STATE OF TEXAS,

**Appellee.**

_____

**Appeal in Cause Number F13-55077-M**
**In the 194th Judicial District Court**
**Dallas County, Texas**
**Hon. Judge Ernest B. White III**

_____

**BRIEF FOR APPELLANT**

_____

**TO THE HONORABLE COURT OF APPEALS:**

**NOW COMES** the Appellant, CESAR BENITEZ, by and through his attorney of record, Russ Henrichs, and respectfully submits his brief setting out points of error of which the Appellant is seeking to reverse his conviction in Cause F-13-55077-M, burglary of a habitation with intent to commit sexual assault, from the 194th Judicial District Court, Dallas County, Texas. The

appellant pled guilty as charged and the trial court sentenced him to 85 years in the Institutional Division of the Texas Department of Corrections. He was sentenced on March 7, 2014 and gave timely notice of appeal on March 20, 2014.

**STATEMENT OF THE CASE**

The appellant advised the court that he would plead guilty to Cause Nos. F13-54265-M, aggravated sexual assault; F13-55077-M, burglary of a habitation with intent to commit sexual assault; and F14-00035-M, burglary of a habitation with intent to comment sexual assault [Vol. 3, RR 8]. The trial court advised the appellant that the range of punishment for the offenses were contained in the court's admonishment and the appellant acknowledged that he had reviewed the documents with his attorney [Vol. 3, RR 8-9]. The appellant stated that he understood the range of punishment available in each case, and would enter a plea of guilty to each of the three aforesaid cases. The appellant relinquished his right to have jury trials in each of the three cases and stated that he was pleading guilty to each charge freely and voluntarily. The appellant stated that he was not a citizen of the United States and was admonished on the consequences of deportation [Vol. 3, RR 10-11]. Consequently, the appellant waived formal arraignment and entered pleas of guilty in the three aforesaid cases [Vol. 3, RR 11].

The State offered State's Exhibit 1, the appellant's signed, written, voluntary judicial confession and stipulation of evidence without objection [Vol. 3, RR 11-12]. The appellant testified that he understood the jury was waiting to come in and try one of his three case, but agreed to combine all of the cases and come back to the trial court for sentencing [Vol. 3, RR 13]. The appellant said he understood the range of punishment on all three cases and did not wish to have a jury trial in any of the three cases [Vol. 3, RR 13-14].

The trial court accepted the appellant's guilty pleas and reset the case for assessment of punishment at a future date. [Vol. 3, RR 14].


## ISSUES PRESENTED FOR REVIEW

I. **THE APPELLANT WAS DENIED DUE PROCESS WHEN THE JUDGE ORDERED A PRE-SENTENCE INVESTIGATION WHICH THE APPELLANT DID NOT RECEIVE OR REVIEW PRIOR TO HIS PUNISHMENT HEARING.**


## STATEMENT OF THE FACTS

Keela Ross, 34, testified that she lives in Collin County and is married to a Garland police officer [Vol. 4, RR 9]. On November 28, 2011, she was at LA Fitness in Plano, right off 190 and Coit. When she went into a dressing room she saw a face under the partition of the handicap stall [Vol. 4, RR 10]. Mrs. Ross said she could tell it was a male peering under the partition and then saw him getting up frantically. When she opened the door, she saw him run by [Vol. 4, RR

11]. Mrs. Ross went to the desk and told them what she had seen and said that the man had been sitting in between the participation and the toilet on the ground before she saw him get up [Vol. 4, RR 11]. She said he had been kneeling down Indian style and looking up before he ran away [Vol. 4, RR 12].

Mrs. Ross called the police as well as her husband and filed a police report. They learned that the appellant had a badge or a key file to the gymnasium there and he had checked in and given his picture, name, and address. Ms. Ross said they were able to look at a screen to see that the appellant had checked in and that he had been going to multiple LA Fitnesses over a two or three day period [Vol. 4, RR 13-14]. They concluded that since he had a key file, the appellant was a member and should have known which bathroom and locker room were for men and which were for women [Vol. 4, RR 14]. Mrs. Ross said that when she saw a drawing in the news, she thought it looked familiar and when the newspaper account said he was a known peeper, she said, "It clicked; this is him" [Vol. 4, RR 14-15].

Gabrila Ibarra, 31, testified that on December 10, 2011, she was out shopping with her husband at "Plain Clothes" where she went into the dressing room [Vol. 4, RR 18]. Mrs. Ibarra said that she subsequently went out and told them that someone was looking at her in the dressing room with a mirror and her husband asked the guy on the other side of the dressing room why he was doing that [Vol. 4, RR 18-19]. She said the man had a little round mirror which was on the floor [Vol. 4, RR 19]. Her husband, who had been standing in the door behind

4

her, began arguing with the man [Vol. 4, RR 19]. Her husband confronted the man again later and got the man's car registration plate and they called the police [Vol. 4, RR 19-20].

Ambracio Ibarra was with his wife on December 10, 2011, when she was shopping in the "Plain Clothes" store [Vol. 4, RR 22]. Mr. Ibarra said when his wife was in the fitting room, she called him saying there was a guy peeking at her using a mirror, so he kicked in the man's door, told him to stop it, and immediately called the police [Vol. 4, RR 22-23]. Mr. Ibarra identified the appellant as depicted in State's Exhibit No. 1 [Vol. 4, RR 23]. The witness also identified State's Exhibit No. 3 as the same car plate that he had seen [Vol. 4, RR 23-24].

Brian Monk testified that he works for Burke's Outlet Loss Prevention and was working at the Kohl's department store in east Plano in April 2012 when a young lady approached him complaining that there was a guy in the ladies' restroom. Mr. Monk made contact with the man and as a result of the incident, made a police report [Vol. 4, RR 28]. Mr. Monk identified the appellant as depicted in State's Exhibit No. 1 [Vol. 4, RR 28]. State's Exhibit 4, a video depicting the appellant leaving the store was offered into evidence without objection [Vol. 4, RR 29].

Dallas police detective Tommy Daily testified that in April of 2013 he was doing surveillance on the appellant [Vol. 4, RR 32]. Detective Daily said that the appellant appeared in April of 2013 as he was depicted in the State's Exhibits 1

5

and 2 [Vol. 4, RR 33]. Detective Daily said he was looking for the appellant because he was wanted in connection with multiple rapes in the northeast area of Dallas [Vol. 4, RR 33]. Detective Daily said that an investigator received an anonymous Crimestopper's tip that led them to a location where the appellant might be living [Vol. 4, RR 33]. The police knew that the appellant was driving a silver BMW and they found him at his girlfriend's apartment, Daily said [Vol. 4, RR 34].

Police initially went to the apartment complex where the appellant was believed to have lived [Vol. 4, RR 34-35]. They were told that two or three days earlier the appellant moved out rapidly [Vol. 4, RR 35]. Detective Daily said that they found the appellant's apartment to be vacant and cleared out [Vol. 4, RR 35].

Police found the vehicle they were looking for near an apartment where the appellant's girlfriend lived and waited for a couple of hours until the appellant appeared and began loading a TV into a car which Detective Daily said was already pretty loaded down [Vol. 4, RR 36]. Police squad cars were appearing as the appellant pulled out of the parking lot [Vol. 4, RR 37]. The appellant backed into a parking spot and exited in his vehicle very fast, Daily said [Vol. 4, RR 37]. The appellant walked around the building, keeping his eyes on the police cars [Vol. 4, RR 38].

Detective Daily got in behind the appellant as he got onto a Central Expressway service road and observed the appellant committing traffic violations

6

as he got onto the freeway. Daily was following him in an unmarked car [Vol. 4, RR 39]. The appellant was speeding, driving faster than the speed limit. [Vol. 4, RR 40]. Daily said he had squad cars come to make a traffic stop for the traffic violations the appellant had committed [Vol. 4, RR 40].

Dallas police officer Jeb Standard, testified that he worked for the METRO Unit, which stands for Measure Enforcement Target Repeat Offender [Vol. 4, RR 41]. Officer Standard was assisting Detective Daily on April 2, 2013, as police conducted surveillance of the appellant [Vol. 4, RR 41-42]. That day Officer Standard saw the appellant driving the silver BMW depicted in State's Exhibit No. 3 and made a traffic stop on the appellant as he headed southbound on Highway 35 [Vol. 4, RR 42].

Officer Standard said that the appellant got out of his vehicle and ran behind a hotel [Vol. 4, RR 43-44]. The appellant ran 75 yards and he caught him as he tried to jump the fence [Vol. 4, RR 44].

Detective Christopher Mayfield with the Allen police department was assigned to investigate a case that occurred at a Target store in Allen, Texas [Vol. 4, RR 46]. Detective Mayfield said that he became involved with an incident there wherein a young female reportedly was using a restroom at Target when a Hispanic male looked underneath her stall and then fled the store after she saw him [Vol. 4, RR 46-47]. The female was approximately 15 years of age. Detective Mayfield said they retrieved a videotape from the store and observed the appellant running out and across the parking lot of the Target store [Vol. 4, RR

7

27]. Detective Mayfield identified the appellant as the person depicted in the State's Exhibits 1 and 2 when he was investigating him in 2012 [Vol. 4, RR 48].

Mary Kramer (pseudonym) testified that she was terrified to have to relive her experience in front of the man who did it [Vol. 4, RR 51]. Mrs. Kramer said on February 21, 2013, she was working for an architectural firm, living with her husband in the Lake Highlands area of Dallas [Vol. 4, RR 52]. She had to spend the weekend by herself when her husband went to Houston for the weekend [Vol. 4, RR 53]. After joining two of her coworkers she got home at about 10:00 p.m. [Vol. 4, RR 53]. After watching TV, she fell asleep but then awakened to a man standing next to her bed [Vol. 4, RR 54]. At first she thought it was a nightmare and closed her eyes, but the man aggressively woke her up. [Vol. 4, RR 54]. Mrs. Kramer said that the lights were out, and she did not have her contacts in [Vol. 4, RR 54-55]. She knew the man was not white, but was not sure what his nationality might be [Vol. 4, RR 55].

The man told her to take off her underwear, and she said, "You don't have to do this," and tried to talk him out of it, but he got more aggressive with her with his tone. [Vol. 4, RR 55]. She told the man that he should use a condom because she had a horrible disease, but he showed her a knife [Vol. 4, RR 56]. She would not take off her underwear, and he kept pulling her shirt and licking her stomach and her breasts [Vol. 4, RR 56]. The man had an accent and she concluded that English was not his first language [Vol. 4, RR 56]. He put the knife in her face. She thought she was going to die, that she would be raped and then killed [Vol.

8

4, RR 57]. She continued to plead about a condom, and the man let her get up and then walked behind her with his knife [Vol. 4, RR 57-58].

She recalled handing the man a condom and getting back into bed and lying on her back [Vol. 4, RR 58-59]. He licked her breasts, stomach, and vagina [Vol. 4, RR 59]. He then climbed on top of her and started raping her [Vol. 4, RR 59]. She said the rape lasted five to ten minutes but felt like forever [Vol. 4, RR 60]. He stopped when he ejaculated [Vol. 4, RR 60]. He began licking her more on her stomach, vagina, and breasts and began pushing the covers over her face [Vol. 4, RR 60].

When he held the knife to her throat, she thought that he would kill her for sure [Vol. 4, RR 61]. He was getting dressed and then he was gone. [Vol. 4, RR 61]. Ms. Kramer ran to a next-door neighbor's house and told them she had been raped and the neighbors called the police [Vol. 4, RR 62]. An ambulance came and took Ms. Kramer to Presbyterian Hospital [Vol. 4, RR 62]. When she left the hospital, she went to her parents' home where she stayed almost three weeks. Ms. Kramer said a second attack occurred in a house which she could actually see from her front yard [Vol. 4, RR 64].

The police took her bedding [Vol. 4, RR 65]. Ms. Kramer said that the man broke a window to get into her house [Vol. 4, RR 66-67]. There was no indication that the man took anything of value from the house [Vol. 4, RR 67].

Ms. Kramer identified State's Exhibits 5 through 21 as pictures of her home as it looked the night she was raped [Vol. 4, RR 67]. State's Exhibit No. 6 is the

9

tiny bathroom that the man broke into [Vol. 4, RR 69]. The man walked through her entire house to get to her [Vol. 4, RR 71]. The ground was moist outside and dirt from the man's shoes was tracked throughout the house, Ms. Kramer said [Vol. 4, RR 73].

State's Exhibits 20 and 21 show a condom out on her back patio. She and the police noticed a footprint there and on the patio [Vol. 4, RR 74]. Ms. Kramer had a bruise that probably lasted about five days [Vol. 4, RR 75]. Since the time of the rape, Ms. Kramer went to counseling every week [Vol. 4, RR 75]. The man did not threaten Ms. Kramer and used very few words. [Vol. 4, RR 82].

Jane Kramer ( pseudonym), 32, testified she works in advertising and lives in the Dallas area [Vol. 4, RR 83]. Married five years, she graduated from Texas A&M and met her husband at a church [Vol. 4, RR 84]. In March of 2013, she and her husband were in the Lake Highlands area of Dallas [Vol. 4, RR 84-85]. On March 19, 2013, her husband, Chad, got up at 5:30 and left for work as Ms. Kramer continued to sleep after he left the house [Vol. 4, RR 85-86]. When she heard her bedroom door open and close, she thought it was her husband coming back and decided to wake up and help him get whatever he might need. Instead she saw a much shorter man with a hood on hovering in the doorway, not her husband [Vol. 4, RR 86]. Ms. Kramer knew from the bulletins and emails from the association that a serial rapist had been attacking women in their neighborhood [Vol. 4, RR 86-87].

As soon as she realized it was not her husband, she jumped up and screamed, "Get out of here" [Vol. 4, RR 87]. The man threw his arm up and hit her in the face [Vol. 4, RR 88]. Hitting her in the jaw, he threw her immediately to the ground and tried to cut off her air flow. He had his hand over her nose and mouth and was trying to suffocate her, she thought [Vol. 4, RR 88]. She was on her back wearing just a nightgown and a pair of underwear, trying to push him off, but he was heavier [Vol. 4, RR 88].

After she tried to push him off and breathe, he immediately started trying to take off her panties [Vol. 4, RR 88]. She tried to bite his finger off as they struggled [Vol. 4, RR 89]. He pulled his hand away and flipped her over and got her panties off as they continued to fight [Vol. 4, RR 89]. He inserted his finger into her vagina. [Vol. 4, RR 90]. She flipped from her back to her stomach and then tried to flip over again to be less vulnerable [Vol. 4, RR 80]. She toppled a table with her foot, and the man was startled as the table fell on top of him. He pulled his hand away, and she was able to get her breath for the first time in a while and started screaming [Vol. 4, RR 81]. When she started screaming, he jumped up and ran out of the room. She tried to find her husband's knife, needing a weapon to defend herself. She then chased the man after he ran out of the room [Vol. 4, RR 92]. She dialed 911 and locked herself into a bathroom in the front hall thinking he was still in the house and would come back for her [Vol. 4, RR 92].

Ms. Kramer identified State's Exhibits 29 and 29(a) as her 911 call [Vol. 4, RR 93]. Neighbors were able to hear Ms. Kramer screaming after she dialed 911, even though she had locked herself in the bathroom [Vol. 4, RR 98]. Police took her to the hospital for a medical examination [Vol. 4, RR 98]. Ms. Kramer's injuries are depicted in State's Exhibits 30 through 40 [Vol. 4, RR 98].

She was taken in a police car to have a sex assault exam [Vol. 4, RR 98]. Her injuries were depicted in State's Exhibits 30 through 40 [Vol. 4, RR 98]. Ms. Kramer lived in fear because the man who raped her wasn't caught until a couple of weeks later [Vol. 4, RR 102].

Rachel Haecker (pseudonym) testified that on March 15, 2013, she was living with a roommate and working actively with her church finding a mission trip [Vol. 4, RR 107-108]. After going to a movie with a friend, she returned home at about 10:30 p.m. and parked in a dark area near her home in Lake Highlands [Vol. 4, RR 109]. Ms. Haecker knew that prior to March 15 someone down on her street had already been sexually assaulted [Vol. 4, RR 109].

After turning on the lights and letting her dogs out, she showered and went to her bedroom [Vol. 4, RR 110]. She heard a couple of unusual thuds and from the shower saw a man by the shower door [Vol. 4, RR 110-111]. The man pulled her by the shoulder and the dogs came in. He pushed the dogs outside and closed the door, not saying anything to her [Vol. 4, RR 111-112]. Then he kept saying, "Bend over, bend over." They then walked out of the bathroom, went into her bedroom as he pushed the dogs away [Vol. 4, RR 113].

12

On the bed he spread her legs to where it became painful and then penetrated [Vol. 4, RR 114]. She screamed out because every thrust was painful and she had never had sex before, having saved herself for marriage [Vol. 4, RR 114-15]. The man did not use a condom and she feared she might get pregnant [Vol. 4, RR 115]. The man did oral sex on her prior to penetrating her [Vol. 4, RR 116]. She asked him why he was doing this and if asked if he knew Jesus. He began to get dressed and started pushing her and telling her to look the other way [Vol. 4, RR 116].

He pushed her out of her bedroom door and then closed it and went through in order to get out of the house [Vol. 4, RR 117]. She couldn't move for approximately five minutes and then started making calls. She called her roommate and parents, fearing that the man would come back again, and they called the 911 dispatcher. The police and an ambulance came at the same time and she was taken to a hospital [Vol. 4, RR 118]. She said the man got in by breaking a window [Vol. 4, RR 119]. She went to Presbyterian Hospital for a rape examination [Vol. 4, RR 121].

Rachel Gutierrez testified for the defense. Ms. Gutierrez testified that she lives in Santiago, Mexico, and the appellant is her son. She said he went to school regularly and was a good child [Vol. 4, RR 126-127]. Ms. Gutierrez asked for forgiveness for her son, she asked for the appellant stating he was a good son and was the pillar of their house [Vol. 4, RR 127]. Ms. Gutierrez said her son

strayed due to what he consumed, and the devil took him over to do what he did [Vol. 4, RR 128].

Pursuant to an agreement of the appellant and the State, the appellant was permitted to read a statement to the victims and their families [Vol. 4, RR 131]. The appellant testified that lived in the Ft. Worth area for 15 years [Vol. 4, RR 132]. He said he always maintained employment and had a solid work history [Vol. 4, RR 132]. He entered a plea of guilty and took the responsibility for the cases [Vol. 4, RR 132].

The appellant's statement was marked by agreement to be read in court by the interpreter [Vol. 4, RR 133-134]. The appellant said that he began to take steroids, which caused him to do things that were wrong [Vol. 4, RR 135]. The appellant asked for forgiveness and expressed his desire to return back to his old country [Vol. 4, RR 135].

The appellant said he asked himself why did he do such a bad thing and concluded that "It was because the evil came upon me and I just don't know the answer."[Vol. 4, RR 137]. He said that if God cured the sick and healed the leper and the prostitute, he seeks forgiveness himself [Vol. 4, RR 137]. The appellant's statement was admitted without objection as Exhibit 1(a) [Vol. 4, RR 138]. The appellant then testified that what led him to make these mistakes was that the "devil grabbed me to take steroids." Ever since 2008 to 2013 he used many types of steroids and was addicted and then consumed Chinese steroids from 2011 to 2013 [Vol. 4, RR 140]. He began injecting himself on a daily basis and could not

14

exercise unless he injected himself [Vol. 4, RR 140]. He said he had a beautiful girlfriend and did not need to do the things he did [Vol. 4, RR 141]. He didn't need to do it because he had a beautiful family, mother and father, whom he always helped to live [Vol. 4, RR 141].

The appellant testified that since he was taken into custody he stopped using steroids and he noticed 100 percent change in his mind [Vol. 4, RR 142]. The appellant said he was interviewed by the probation department in jail who asked him to give a statement in preparation for the hearing [Vol. 4, RR 144]. When the probation officers asked him about drug usage and history of that, he told them he used cocaine and referred to the steroids as part of his drug history. He denied that drugs caused him to commit the offenses. He said that the destruction was from the steroids [Vol. 4, RR 145]. The appellant said he didn't plan on committing the rapes, but the devil took over his mind. He lived in the same neighborhood as the victims and thought they were beautiful and pretty and paid attention to them, even to the extent of knowing what kind of cars they drove [Vol. 4, RR 146].

The appellant reiterated that the steroids blocked his mind and dominated him, which caused him to rape the women [Vol. 4, RR 147]. The appellant said he considers himself a victim [Vol. 4, RR 147]. He said before he took the steroids he had never had any complaints from people about breaking into houses or assaulting women [Vol. 4, RR 147]. The appellant said that he was

15

traumatized when the victim hit him and screamed at him. He covered her mouth

so he could leave and denied putting his finger in her part [Vol. 4, RR 149].

## POINT OF ERROR NUMBER ONE RESTATED

**THE APPELLANT WAS DENIED DUE PROCESS WHEN THE JUDGE ORDERED A PRE-SENTENCE INVESTIGATION WHICH THE APPELLANT DID NOT RECEIVE OR REVIEW PRIOR TO HIS PUNISHMENT HEARING.**

## SUMMARY OF THE ARGUMENT

In the present case, the trial court ordered a pre-sentence investigation, which was referred to and debunked during the punishment hearing. There was nothing in the record to indicate that the appellant was apprised of the findings made by the probation officers who interviewed him. Consequently, the appellant was cross-examined about a document that was never offered into evidence as an exhibit, and which he did not have the opportunity to review.

Defense counsel had requested a pre-sentence investigation at the time the appellant decided to plead guilty to three offenses:

> "THE COURT: Mr. Key, there was something you wish to put on the record.
>
> "MR. KEY(Defense counsel) : Your Honor, based on my conversations with the State, which were conveyed to the defendant, the defendant has elected, one, to -- with the consent of the State, to enter a plea to the three charges that are pending against him -- or actually I believe there is four, one is going to be dismissed, that is superseding indictment. Defendant has elected to enter a plea of guilty to those charges. He has filed an application for probation in this case. We lock the plea in today, and set for a presentence investigation and come back later for sentencing.
>
> "THE COURT: Very well.

17

"MR. KEY: And that's with Mr. Derrick's approval.

"MS. DERRICK: Yes.

"MR. KEY: And any sentence imposed by the Court will run concurrently.

"MS. DERRICK: Yes." (Vol. 4, RR 7)

"MR. KEY: Your Honor, comes now Cesar Benitez who states that is his true and correct name as contained in the indictment. He waives arraignment, formal presentation of the charging instruments, enters a plea of guilty in each case that are so numbered as stated by the Court. Would ask the Court to accept the plea and order a presentence investigation in each case." (Vol. 3, RR 7).

The appellant said he was interviewed by the probation department in jail who asked him to give a statement in preparation for the hearing [Vol. 4, RR 144]. When the probation officers asked him about drug usage and history of that, he told them he used cocaine and referred to the steroids as part of his drug history. He denied that drugs caused him to commit the offenses.

In his punishment summation, defense counsel referred to the Presentence Investigation:

"Your Honor, the defendant has filed an application for probation in each one of these cases. And pursuant to that, the Court ordered the probation department to go over the eval. In the report that the probation department submitted back to the Court, it lists a number of things that are available to the Court to help treat people such as Mr. Benitez. And we do believe that he would

18

benefit and society would benefit from him undertaking those classes and other various things that the probation department has for people such as Mr. Benitez" (Vol. 4, RR 149, 150).

The prosecutor also referred to the pre-sentence investigation in her closing punishment summation:

"And, in fact, (the appellant) has told us here that they consented to sex and told as much to the probation department in his PSI, because he didn't threaten to kill them. Although he begrudgingly admits that he did bring a knife with him to Mary Kramer's house (RR vol. 4, 152, 153).

## ARGUMENT

Procedures for pre-sentence investigation are set out in pertinent part in Article 42.12 section 9

Below:

" Sec. 9. Presentence Investigations.

(a) Except as provided by Subsection (g), before the imposition of sentence by a judge in a felony case, and except as provided by Subsection (b), before the imposition of sentence by a judge in a misdemeanor case the judge shall direct a supervision officer to report to the judge in writing on the circumstances of the offense with which the defendant is charged, the amount of restitution necessary to adequately compensate a victim of the offense, the criminal and social history of the defendant, and any other information relating to the defendant or the offense requested by the judge. It is not necessary that the report contain a sentencing recommendation, but the report must contain a proposed client supervision plan describing programs and sanctions that the community supervision and corrections department would provide the defendant if the judge

19

suspended the imposition of the sentence or granted deferred adjudication. If the defendant is charged with a state jail felony, the report must contain recommendations for conditions of community supervision that the community supervision and corrections department considers advisable or appropriate based on the circumstances of the offense and other factors addressed in the report."

The United States Supreme Court reversed and remanded a death penalty case in which a Presentence report was partially relied upon without the report being disclosed or requested by the parties:

"Petitioner was convicted of first-degree murder in a Florida court. After the required separate sentencing hearing, the jury advised the court to impose a life sentence on the ground that the statutory mitigating circumstances required to be taken into account in imposing a sentence outweighed the aggravating circumstances. But the trial judge, relying in part on a presentence investigation report that he had ordered and portions of which were not disclosed to or requested by counsel for the parties, imposed the death sentence on the ground that a certain aggravating circumstance justified it and that there was no mitigating circumstance. The Florida Supreme Court affirmed the death sentence without expressly discussing petitioner's contention that the sentencing court had erred in considering the presentence report, including the confidential portion, in deciding to impose the death penalty, and without reviewing such confidential portion. Held: The judgment is vacated and the case is remanded. Pp. 355-364." *Gardner v. Fla.*, 430 U.S. 349, 97 S. Ct. 1197, 51 L. Ed. 2d 393, 1977 U.S. LEXIS 62 (U.S. 1977)

Reversing, the U.S. Supreme Court wrote:

"The imposition by a state court trial judge of the death sentence for first degree murder, based in part on information in a presentence investigation report, a confidential portion of which was not disclosed to the defendant or his counsel, and the affirmance of

20

the death sentence by the state's highest court without reviewing the confidential portion of the presentence report (which confidential portion was not included in the record on appeal), will be held to be unconstitutional, and the United States Supreme Court will vacate the death sentence and remand the case to the state's highest court with directions to order further sentencing proceedings at the trial court level, rather than merely remand with directions to have the entire presentence report made a part of the record to enable the state's highest court to complete its reviewing function, where (1) three members of the Supreme Court are of the view that the procedure employed by the state court did not satisfy the constitutional command that no person shall be deprived of life without due process of law, (2) a fourth member of the court concurs in the judgment, without filing a written opinion, (3) a fifth member of the court is of the view that the *Eighth Amendment's* ban on cruel and unusual punishment was violated by the use of secret information in imposing the death penalty, and (4) a sixth member of the court concurred in the judgment in light of the judgments of the *Supreme Court in Woodson v North Carolina* (1976) 428 US 280, 49 L Ed 2d 944, 96 S Ct 2978, and *Roberts v Louisiana* (1976) 428 US 325, 49 L Ed 2d 974, 96 S Ct 3001. [Per Stevens, J., Stewart, J., Powell, J., Burger, Ch. J., White, J., and Blackmun, J. Dissenting in part: Brennan and Marshall, JJ. Dissenting: Rehnquist, J.] "

In the present case, defense counsel requested the pre-sentence report. But the record does not show that the appellant, a Spanish speaker, was ever apprised of the contents of the report nor was the report entered into evidence. His account to probation officers was used by the prosecutor in questioning him, and possible favorable portions of the report, such as his addiction to steroids causing his behavior to spin out of control, where not disclosed to the appellant or developed any further.

21

Because the appellant was not apprised of the contents of the presentence report and was not able to utilize it in any way, he maintains that due process was violated, and prays for reversal.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED,** the Appellant urges this Honorable Court to review the points of error presented and to determine whether or not reversal of this cause is required. If the Court finds that the points of error presented do justify reversal, the Appellant would move that such reversal of the conviction be granted. The Appellant prays that this cause be reversed and remanded, or alternatively, that an acquittal be entered.

Respectfully submitted,

_/s/ Russ Henrichs_____
RUSS HENRICHS
SBC NO. 09475000
P.O. Box 190983
Dallas, Texas 75219
214-651-0759
ATTORNEY FOR APPELLANT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Appellant's Brief was, on this the 16th day of January, 2015, emailed to the District Attorney's Office, Appellate Division, Dallas County, Texas, by the undersigned.

_/s/ Russ Henrichs_____
RUSS HENRICHS

CERTIFICATE OF COMPLIANCE

I certify that this submitted CD or e-mail attachment of the brief complies with the following requirements of the Court:
1. The brief is submitted on a CD or by e-mail attachment;
2. The CD or e-mail attachment is labeled with the following information:
A. Case Name: Cesar Benitez
B. The Appellate Case Number: 05-14-00385-CR
C. The Type of Brief: Appellate Brief
D: Party for whom the brief is being submitted:
Cesar Benitez
E. The Word Processing Software and Version Used to Prepare the Brief:
Word, converted to PDF.
3. The CD or e-mail attachment contains only an electronic copy of the brief and the appendix, if applicable. The documents in the appendix conform to the requirements of Texas Rules of Appellate Procedure 9.8 and 38.1(k).
4. The CD or e-mail attachment is free of viruses or any other files that would be disruptive to the Court's computer system. The following software, if any, was used to ensure the brief is virus-free: Microsoft Security Essentials
5. I understand that a copy of this brief may be posted on the Court's website and that the electronically filed copy of the brief becomes part of the Court's record.
6. Copies have been sent to all parties associated with this case.

*s/Russ Henrichs* 1-16-15
(Signature of filing party and date)

Russ Henrichs

_____
(Printed name)

Russ Henrichs, Attorney at Law

_____
(Firm)